Beecher FRANK, Appellant,

v.

Roy L. SILVERS, Appellee.

Court of Appeals of Kentucky.

May 5, 1967.

Viley O. Blackburn, Smith & Blackburn, Somerset, for appellant.

Lawrence S. Hail, Somerset, for appellee.

PALMORE, Judge.

Beecher Frank appeals from a judgment entered pursuant to a jury verdict awarding Roy Silvers $7,259.85 for personal injuries and damages suffered by Silvers as the result of his being struck by an automobile driven by Frank.

Frank's only contention is that Silvers was negligent as a matter of law and that a verdict should have been directed accordingly.

The accident took place a few minutes before 8:00 p. m. on January 3, 1963. The night was dark, but it was dry and there were no inclement weather conditions. Frank was driving southward on the U. S. Highway 27 by-pass around the west side of Somerset, in Pulaski County. Silvers had been in Somerset all afternoon and was walking home along the Oak Hill Road, which intersects U. S. 27 at a slight angle from northeast to southwest. The intersection was just outside the city limits. There were no marked crosswalks. Oak Hill Road was a 2-lane blacktop road. U. S. 27 was a 4-lane concrete highway 60 feet wide with safety islands in the center. Silvers' course of travel was southwestward along the left or south side of Oak Hill Road. Frank was driving in the westernmost of the two southbound lanes of U. S. 27.

The islands in the center of U. S. 27 were about 12 feet wide, leaving two 12-foot traffic lanes on each side. Silvers first noticed the approaching automobile of Frank at a distance of some 400 feet to the north as he started to walk across the west 24 feet of U. S. 27. Then, according to Silvers, "I started across the highway and I got about halfway across the two southbound lanes, or maybe farther, and I looked back down, towards the north, down the highway and I saw that he was getting too close upon me, and that's when I started to run to get out of his way, and as I was running I kept looking to him and he just kept coming it seemed like, towards me all the time." Silvers estimated that the car was about 60 feet away when he saw it for the second time and that when he was struck he lacked about two feet of reaching the west edge of the pavement. In explanation of why he tried to run across the remainder of the highway instead of stopping where he was, Silvers said in substance that he could not tell which way the car might turn.

Silvers admitted he had consumed a half pint of cut alcohol in town during the early hours of the afternoon, but denied being intoxicated. A blood sample taken from his arm shortly after the accident showed an alcoholic content of 0.15 per cent.

Frank's vehicle was a 1962 model Valiant station wagon, which is smaller than the average automobile and is in the category generally referred to as "compact" cars. The posted speed limit on U. S. 27 in the area of the Oak Hill Road intersection was 45 m. p. h. Frank was driving at 40 to 45 m. p. h. and had his headlights deflected because "that is a sort of a restricted zone there." He judged that he could see 500 to 600 feet ahead under normal unobstructed conditions, but on this particular occasion a car had entered the intersection from the east on Oak Hill Road and had stopped between the safety islands with the beam of its headlights projecting across the southbound lanes of U. S. 27. This car was being driven by the witness Phillips, who was waiting for Frank to pass before continuing across U. S. 27. When Frank was about 400 feet north of the intersection he saw a man appear on foot in front of the Phillips vehicle and he took his foot off the accelerator, but then the man disappeared into the darkness and Frank, thinking he had merely gone around from one side of the Phillips car to the other, resumed his speed. When he had approached within 150 to 120 feet of the point of the accident he suddenly became aware of Silvers walk-

ing in the eastern lane of the two south-bound lanes, "the lane nearest the island, he was coming across this lane in almost a lurching, staggering fashion, I saw him take a couple of steps, and then he was in the center of that left hand lane and after taking a couple of steps, he broke into a sprint, a run," etc. Frank applied his brakes and skidded, striking Silvers with the right front portion of his automobile at a point in the intersection which Frank estimated to be five feet from the west margin of the U. S. 27 pavement. According to Frank, the point of impact was about in the middle of Oak Hill Road as extended through the intersection of U. S. 27.

As measured by a state trooper upon arrival at the scene of the accident, Frank's tire marks were 92 feet long and began approximately 60 feet north of the intersection. They were straight, indicating that the vehicle did not turn or swerve from its direct course. The fair import of Frank's testimony is that he did not have time to do more than jam on the brakes, after which the car was locked in position insofar as the direction of its movement was concerned.

According to a map prepared by a registered engineer, Oak Hill Road appears to be about 25 feet wide except at the four corners of its intersection with U. S. 27, which are rounded. The witness Phillips, who was stopped between the safety islands on U. S. 27 preparatory to continuing westward on Oak Hill Road, first observed Silvers when he heard the friction of Frank's tires on the pavement. Silvers was then midway across the southbound lanes of U. S. 27 and was starting to run. He was hit by the car at a point two or three feet from the west edge of the U. S. 27 pavement. Frank's car skidded only five or six feet after striking Silvers and came to a stop within 20 to 30 feet. Silvers was not in the beam of Phillips' headlights, but "just to the left of them a little bit." Phillips testified that Silvers had not crossed in front of his automobile. He said also that there was nothing about the manner in which Silvers ran to indicate that he was drunk.

During the course of his testimony under cross-examination Silvers was required to draw a line depicting on a photograph the course of his travel across the intersection. From a comparison of the photograph with the engineer's diagram heretofore mentioned, the photograph appears to have been taken from a rather deceptive angle, in that a straight line drawn from the southeast corner to the southwest corner of the intersection appears to run at about a 45-degree angle from U. S. 27, and at first glance gives the impression of running diagonally through the intersection. The center line of Oak Hill Road does not follow a straight course through the intersection, because on the west side of U. S. 27 the road is offset several feet southward. Hence a person walking across U. S. 27 from east to west along a straight course projected from the south line of Oak Hill Road on the east side of U. S. 27 would cross the west line of U. S. 27 a few feet north of the south line of Oak Hill Road as it exists on that side. This makes it distinctly possible that Silvers actually was in or near the middle of Oak Hill Road, as Frank contended, without being within the beam of the headlights of the Phillips automobile. However, a careful examination of the photograph marked by Silvers, coupled with his testimony in that connection, indicates to us that he was attempting to draw a line from the southeast corner to the southwest corner of the intersection, which would have put him within the protected area of an unmarked crosswalk if KRS 189.-570(2) is applicable.

With exceptions not pertinent to this case, subsection (2) of KRS 189.570 provides "where traffic control signals are not in place * * * the operator of a vehicle shall yield the right of way to a pedestrian crossing the roadway within any marked cross walk or within any unmarked cross walk at an intersection. If necessary in order to yield the right of way, the operator shall slow down or stop." Conversely,

subsection (4) of the same statute provides that a pedestrian "crossing a roadway at any point other than within a marked cross walk or within an unmarked cross walk at an intersection shall yield the right of way to all vehicles upon the roadway."

Each of the parties asked for an instruction to the effect that it was the duty of the other to yield the right-of-way. Both were refused. Silvers' request for an instruction on last clear chance likewise was refused. The instruction on Frank's duties enumerated the usual requirements as to lookout, speed, control of the automobile, and ordinary care. The contributory negligence instruction required Silvers to remain out of the way of the approaching automobile if it was so near the intersection as to cause a danger and a hazard to him, and it held him to the standard of care ordinarily expected of a sober person.

Frank contends that KRS 189.570(2) does not apply outside the corporate limits of cities. The basis for this argument is the following passage from Kentucky Virginia Stages v. Tackett's Adm'r, 294 Ky. 189, 171 S.W.2d 4, at 9 (1943):

"We know of no statute or rule of law requiring a pedestrian to yield the right of way to a motor vehicle except KRS 189.-570 * * * which has no application to country roads or villages where there are no intersections or marked crosswalks."

If that proposition were correct, it seems to us that the argument would weigh against Frank rather than in his favor, because his position is that the automobile had precedence over the pedestrian, whereas in the absence of the statute neither would have had a superior right over the other. Pryor's Adm'r v. Otter, 268 Ky. 602, 105 S.W.2d 564 (1937). As we view it, the latter situation is the very thing the statute was intended to avoid. Its purpose was and is to make it clear that on the open road and between intersections, where no crosswalk has been established for pedes-

trians and so marked, pedestrians must yield to vehicular traffic, but at highway and street intersections, and at all places where the public authority has marked off intersecting walkways, if vehicle and pedestrian are proceeding on a collision course the vehicle must yield. "Where the pedestrian would probably reach the meeting point first under those conditions, he has the right of way," and "if they would reach the point simultaneously—the statute requires the automobile to yield to the pedestrian." Whittaker v. Thornberry, 306 Ky. 830, 209 S.W.2d 498, 502 (1948).

The substance of what is now KRS 189.-570 was added to the law of Kentucky by Chapter 106, § 13 (17)–(22), Acts of 1938. Before that time the respective rights and duties as between a pedestrian and the operator of a motor vehicle in the highway were governed by the common law principles of ordinary care and a statute (Ky. Stat. § 2739g–35) requiring the motorist to operate his vehicle in a careful manner "with due regard for the safety and convenience of pedestrians and all other vehicles or traffic upon such highway." This statutory duty remains in force through KRS 189.290 but is supplemented by KRS 189.570. For an excellent discussion of the effect of the 1938 amendment see Whittaker v. Thornberry, 306 Ky. 830, 209 S.W. 2d 498, 502 (1948). See also Pryor's Adm'r v. Otter, 268 Ky. 602, 105 S.W.2d 564 (1937), involving an ordinance which contained provisions similar to those which were later enacted by the General Assembly in 1938.

KRS 189.570 was assumed without question to be applicable in Couch v. Holland, Ky., 385 S.W.2d 204 (1964), and Myers & Clark Company v. Layne, Ky., 312 S.W.2d 463 (1958), both of which dealt with accidents that did not occur in the corporate limits of any city. Though it could scarcely be denied that the "unmarked crosswalk" aspect of the statute may place a burden on the unsuspecting motorist who suddenly encounters an intersection in the country, we

do not have any tenable basis for saying it cannot mean what it plainly says.

■ When not so marked, what is a crosswalk? In Myers & Clark Company v. Layne, Ky., 312 S.W.2d 463, 465 (1958), it was said to be a place where pedestrians customarily cross. The later case of Clark v. Smitson, 346 S.W.2d 780 (1961), in accordance with the express terminology of the statute, restricted the definition to intersections, it being observed that a motorist can reasonably be expected to anticipate that pedestrians may be encountered at intersections. This being so, it is our conclusion that there is a crosswalk at every intersection of public roads or highways, and that this is the intended meaning of the statute. As it is common knowledge, every motorist is presumed to know that pedestrians do use the margins of public streets and highways as avenues of travel, that to some degree at least all roadways are so used, and that when such pedestrians come to intersections they must cross. The motorist's duty in approaching an intersection cannot be made to depend on the number of pedestrians who customarily cross there, because that often will be beyond his knowledge. His duty and the corresponding right of the pedestrian must be premised on the existence of the intersection, whether it be used by few or many.

■■ If Silvers was reasonably within the confines of a course a pedestrian would be required to travel in crossing U. S. 27 along the south side of Oak Hill Road and, when he started across the west or southbound traffic lanes, would normally have reached a point in Frank's line of travel before or at the same time as the Frank vehicle, under the decisions already cited he had the right-of-way. Under the evidence the jury could reasonably have resolved each of these factual questions either way. Moreover, as pointed out in the same decisions, the right of neither party is absolute, so that even if the speeds and distances were fixed and certain, it would not be consonant with the principles of ordinary care to eliminate the human equation. For example, let it be assumed that in actuality the Frank vehicle would have intercepted Silvers' line of travel an instant before Silvers would or should have arrived at the same point, but because of the small size of the Frank automobile, coupled with its headlights being deflected, the car appeared to be a considerably greater distance away than in fact it was when Silvers, judging that he had time to cross without incident, stepped forth from his place of safety on or near the island. Could it be fairly held as a matter of law that Silvers' judgment was negligent? We think not. And if he was not negligent at that time, it may not have been unreasonable for a jury to conclude that he should not be held responsible for having created the emergency with which he was confronted upon arriving at a position of peril.

■ Even if it were conceded that Silvers was contributorily negligent as a matter of law, we are of the opinion that he was nevertheless entitled to have the question of last clear chance submitted to the jury. Cf. Riley v. Hornbuckle, Ky., 366 S.W.2d 304, 307 (1963).

■ Our conclusion is that the trial court should have instructed on KRS 189.570, both ways, but that under no theory could Frank have been entitled to a directed verdict.

■ Frank's motion for new trial stated eight grounds, including the trial court's failure to instruct as requested and its refusal to direct a verdict. On this appeal only the latter objection is pursued. Hence any objection to the form of the instructions, short of a directed verdict, is waived. Halleron v. Carrithers Creamery, Ky., 239 S.W.2d 92 (1951).

The judgment is affirmed.

WILLIAMS, C. J., and HILL, MILLIKEN, OSBORNE and STEINFELD, JJ., concur.